## BEERY *v.* UNITED STATES.

JURISDICTION — *of district court under laws of United States.* The acts of congress of 1856 and 1858 (11 Stat. at large, 49–366), limiting the number of courts which have jurisdiction in cases arising under the constitution and laws of the United States, are applicable to this territory.

*But one court* in each judicial district can entertain such pleas, and the jurisdiction of that court extends throughout the district.

For a crime committed in the county of Park, in the first judicial district, the offender may be indicted and tried in the county of Arapahoe in the same district.

*Of the power of the legislature to designate the court which shall have such jurisdiction.* Under the act organizing the territory, the legislative assembly has authority to designate the court in each district, which shall have and exercise the jurisdiction of a circuit and district court of the United States.

*Of the manner in which that may be done.* The act of 1870 (8 Sess. 59), which provides that terms of court, for the transaction of business arising under the constitution and laws of the United States, shall be held at the county seat of the county of Arapahoe, at the times herein provided for holding courts at that place, sufficiently designates the district court of Arapahoe county, as the court which should have such jurisdiction in the first district.

That act is not regarded as creating terms of court for the trial of causes arising under the laws of the United States, but rather as designating the court which should exercise such jurisdiction.

*Of the terms of court.* And where, in a subsequent act (9 Sess. 89), changing the terms of court, nothing was said as to causes arising under the laws of the United States, the court had jurisdiction of such causes at the newly-appointed terms.

LARCENY — *of a letter or packet from a mail or post-office.* Section 22 of the act of 1825 (4 Stat. at large, 108), defines as separate and distinct crimes:
    1. Stealing a mail letter or packet which does not contain an article of value, from or out of a post-office.
    2. Taking a letter or packet, which contains an article of value, from or out of a post-office, with or without the consent of the person having custody thereof, and embezzling or destroying the same.

*An indictment* which charges that the prisoner *stole* from a post-office, a packet containing $40 in currency and $1,000 in gold-dust, which was intended to be conveyed by post, and secreted and embezzled the same, is sufficient under the clause last mentioned.

Whether the currency and gold-dust was mailable matter is not material. It is enough that they were articles of value.

*Of the power to summon jurors.* The power to select and summon jurors in cases arising under the laws of the United States, although not given by statute, exists by force of the common law.

In the absence of statutory regulation, the court, when sitting for the trial of

causes arising under the constitution and laws of the United States, may cause jurors to be summoned from the body of the district under an open venire directed to the marshal.

*By whom the process shall be executed.* The marshal of the territory, as the executive officer of the court when sitting for the trial of such causes, may lawfully serve a venire for jurors.

*Whether the jurors should come from the county.* That the jurors were not summoned from the county in which the offense is alleged to have been committed, is not a ground of challenge to the array.

*Whether the jurors should come from the district.* That the jurors were not summoned from the body of the district is however a good objection, and this being averred in the challenge and admitted by demurrer, was well taken.

*Of the practice in cases of federal jurisdiction.* In cases arising under the laws of the United States, the practice and method of proceeding is the same as in cases arising under the laws of the territory.

*Of the right to challenge jurors.* And one who is charged with crime under a law of the United States may have advantage of a law of the territory which gives the right to challenge a certain number of jurors without assigning cause therefor.

EVIDENCE — *of confessions improperly obtained.* Where a prisoner was induced to make confession of guilt by promise of favor, such confession should not be received against him.

And where such confession was reiterated at a subsequent meeting between the prisoner and the prosecuting witness, and there was reason to believe that the prisoner was then under the influence of the previous promise, and the promise was in fact renewed, the subsequent declarations were also inadmissible.

*Of acts accompanying admission.* That the prisoner produced gold-dust and identified it as that which had been stolen, may be shown.

But the accompanying declaration, if it amount to a confession of guilt, and it was drawn from the prisoner by promise of favor, cannot be received.

*Admissions voluntarily made.* Declarations made to another witness at another time and place, when no improper influence was used against the prisoner, were properly received.

### *Error to District Court of the First District.*

THE indictment, which was presented at the April term, A. D. 1872, contained four counts. In the first it was alleged that on the 21st day of July, 1871, at the Fairplay post-office, in the county of Park, in the first judicial district, the prisoner feloniously did steal from and out of the post-office a certain packet contrary to the form of the statute, etc. The second count was substantially the same.

In the third count it was alleged that the prisoner entered the post-office at Fairplay, and took therefrom a certain packet containing certain articles of value, to wit: forty dollars in currency and one thousand dollars in gold-dust, which said packet was intended to be conveyed by post, and secreted, and embezzled the same. In the fourth count it was alleged that the prisoner feloniously did steal from the post-office at Fairplay a certain registered packet, which had lately, before then, been put into the mail at Oro City, to be conveyed by post to Denver, which packet contained articles of value, to wit: $40 in currency, the property of William Stoner, and secreted, and embezzled the same. The prisoner moved to quash the indictment, and assigned numerous objections, some of which are noticed in the opinion of the court. The motion was overruled. At the October term the prisoner challenged the array of petit jurors, and assigned the following reasons:

1. That the jurors had not been selected and summoned according to the law of Colorado.

2. That they were not summoned according to any law of the territory, nor of the United States.

3. That the jurors were summoned by the U. S. marshal, without authority of law, and contrary to the laws of the territory.

4. That the jurors were not selected and summoned from the body of said district, or from Park county, where the offense was alleged to have been committed.

5. That the *venire facias* to the marshal was issued without authority of law, and contrary to the laws of the territory, and every other law, and was improperly tested.

6. That the U. S. marshal is not authorized to summon jurors in Colorado territory, but it is the sheriff's duty.

A general demurrer to this challenge was sustained. At the trial John B. Furay, a special agent of the post-office department, testified that he visited Fairplay about the 29th of October, 1871, and received from the prisoner thirty and one-half ounces of gold-dust and $100 in currency; that he had conversations with the prisoner at this time, and sub-

sequently in the month of January, 1872, at Denver; that the meeting in Denver was in pursuance of a previous arrangement with the prisoner. The witness also stated that at the first conversation with the prisoner, in Fairplay, he advised the prisoner to make full restitution, and, if he did so, it would go easy with him; that it would be better for him to confess; that the door of mercy was open, and that of justice closed; that he threatened to arrest him, and expose his family, if he did not confess, and the like; that at the meeting in January he made similar promises and threats, to prevent the prisoner from running away. Upon this the prisoner's counsel objected, that the declarations were made under the influence of promises of favor and of threats, and the objection was overruled. The witness then detailed a conversation with the prisoner, in which the latter stated that the gold-dust, by him returned, was all that remained of that which he had taken, and promised to pay the balance. The prisoner also made some statements concerning an envelope in which the gold was inclosed at the time it was stolen, and which was subsequently found in the cellar of the building where the post-office was kept. Other admissions, made at the meeting in Denver, were also admitted. In addition to this, one David Browner testified that he had a conversation with the prisoner in the month of February, 1872; at another place, in the county of Park, during which he asked the prisoner why he confessed, and the prisoner replied that he could not bear to have the blame rest on innocent parties; that it was too much of a load. Upon this occasion nothing was said by Browner, or any others, to induce the prisoner to make any declarations. Testimony was also given tending to prove that a package, which had been mailed at Oro City, containing currency and gold-dust, as alleged, was stolen from the post-office at Fairplay, in the night-time, as alleged. Much evidence was given respecting the search for, and discovery of, the wrapper in which the package was inclosed. The prisoner was found guilty, and, upon

motion for new trial, the objections to evidence were renewed. A motion was also made in arrest of judgment, in which it was alleged that the court was not held at a time appointed by law, and that there was no law authorizing the court, when sitting in the county of Arapahoe, to transact business arising under the constitution and laws of the United States, in the district at large. This motion was also overruled, and judgment was given against the prisoner.

Mr. J. Q. CHARLES, for plaintiff in error.

No brief filed by the United States Attorney.

Mr. JUSTICE WELLS dissented.

HALLETT, C. J. The constitution of the district court is impeached upon the ground that it was not held at the proper time and place, and that the jurors, grand and petit, were not regularly selected and summoned. As to the place, it is contended that the court sitting in Arapahoe county could not take cognizance of an offense committed in another county, although in the same judicial district, a position which, it is said, is supported by the language of the organic act. Touching the judicial power, the act establishing this territory is substantially the same as that by which the territory of Wisconsin was organized in 1836, and which has served as a model for all territorial governments erected since that time. *Clinton* v. *Englebrecht,* 13 Wall. 444 ; 5 U. S. Stat. 10–12; id. 176. It provides that the territory shall be divided into three judicial districts, in each of which a district court shall be held, at such time and place as may be prescribed by law. In the Wisconsin act, and in some others copied from that, the language is, a district court, or courts, shall be held at such times and places as may be prescribed by law, by which provision was made for more than one court in each district, if more than one should be required. That the language of our act was inadvertently changed to the singular number, suffi-

ciently appears from the 15th section, by which the governor was authorized to define the judicial districts, and appoint the times and places of holding courts *in the several counties and subdivisions in each district*, until the legislative assembly should otherwise provide. *Klopfer* v. *Keller*, 1 Col. 410.

In the territories of Wisconsin and Iowa, and probably in others, prior to 1856, the several courts of each judicial district held and exercised the jurisdiction of circuit and district courts of the United States. *U. S.* v. *Morgan*, Morris (Iowa), 341 ; *U. S.* v. *Dickey*, id. 412 ; *Mau-zau-ne-kah* v. *U. S.*, 1 Pinney (Wis.), 124. In the acts organizing those territories, as in our own, it was provided that each of the said district courts shall have and exercise the same jurisdictions in all causes arising under the constitution and laws of the United States, as is vested in the circuit and district courts of the United States, and the first six days of every term of said courts, or so much thereof as shall be necessary, shall be devoted to the trial of causes arising under the said constitution and laws. Upon this, it is plain, that within the territory assigned to each, the several courts of each district had the same jurisdiction under the laws of the United States ; for the reference is to each of the said districts' courts, a phrase which comprehends all of the courts, whatever their number. Our act, being a copy of the Wisconsin act, must have received the same construction if there had been no further legislation upon the subject. In 1856, however, congress conferred upon the judges of the territories, power to appoint the times and places of holding courts in the several districts, and declared that courts should not be held at more than three places in any one territory. 11 U. S. Stat. 49. It was not in that act provided that the three places, therein referred to, should be in the several judicial districts ; but as all the acts establishing territories, which were then in force, contained the provision for three districts, it was obviously the intention of congress that one court should be held in each district. By another act, passed two years later, the prac-

tice which had obtained prior to 1856 was restored "for the purpose of hearing all matters and causes, except those in which the United States is a party." 11 U. S. Stat. 366. We have then the act of 1856, reducing the number of courts to one in each district, which, by the organic act, was invested with the jurisdiction of circuit and district courts of the United States, and the act of 1858, again increasing the number but declaring that the courts thus added should not have jurisdiction in United States cases. Considered without reference to prior legislation, perhaps the act of 1858 would deprive all of the courts of federal jurisdiction, for it declares that the courts, held in the several counties, shall have jurisdiction in all matters and causes, *except those in which the United States is a party*, and does not, in terms, provide that any one of the courts shall have jurisdiction in the excepted cases. This ambiguity is explained by the acts preceding, and, to some extent, by the proviso to this act from which it appears that the object of the act of 1856 was to diminish the expense of these courts to the general government. To serve the convenience of the people, the number of courts was again increased in 1858, and probably this was the only purpose of the act of that year. Following the history of congressional legislation upon this subject, we find that all territorial courts were first invested with the jurisdiction of circuit and district courts of the United States; and for the purpose of diminishing the expenses of such courts to the general government, the number was in 1856 restricted to three in each territory. In 1858 provision was made for additional courts in the several counties of each district, in which cases arising under the laws of the territory should be determined, but not those in which the United States was a party. Obviously, the effect of the acts of 1856 and 1858, considered with reference to the practice which previously obtained, was to provide that but one court in each district should exercise the jurisdiction of circuit and district courts of the United States, and it appears to me that no greater effect should be given to them. But it may be contended that these acts of 1856 and 1858,

although amendatory of the acts establishing territories then in force, cannot be applied to one which like our own was subsequently enacted in the language of the Wisconsin act, without reference to the pre-existing amendments. If this was a case in which congress had revised the organic law of a territory with a view to correct errors therein, we should, of course, reject every thing not embodied in the text, for in such case the presumption is, that things omitted have been rejected. But the act establishing this territory does not present a case of revision, but rather the creation of a new government, in form and character the same as others already existing. This territory was carved out of Kansas, Nebraska, Utah, and New Mexico, all of which were existing when the acts of 1856 and 1858 were passed, and the government was framed upon the model of its predecessors. Indeed, it has never been the policy of congress to confer exceptional powers upon any of the territories, and, althought slight changes in the form of government have been made, such changes have affected all alike. Under these circumstances, the adoption of the Wisconsin act by congress, without adverting to the amendments of 1856 and 1858, has not here been regarded as sufficient to exclude the acts last mentioned from all connection and association of the former. It will also be observed, that the acts we are considering are not limited to the territories existing at the time they were passed ; they are general laws, applicable to all the territories alike, although some of them may have been established after the laws were enacted. But, if inconsistent with an act subsequently passed, of course they cannot be regarded, and, therefore, we resolved, in *Klopfer v. Keller* 1, Col. 410, that the provision of our organic act, which requires that the times and places of holding courts shall be designated by the legislative assembly, must prevail in opposition to the act of 1856, which vests the same power in the judges of the territory. As to the courts which shall have jurisdiction under United States law, the organic act does not appear to be inconsistent with the prior acts referred to, for the phrase, "Each of said supreme and

district courts," which is used in the organic act to desig
nate the courts which shall have such jurisdiction, may
well enough, so far as it relates to district courts, refer to
one court in each district, as prescribed by previous
laws. To give effect to prior acts, we must accept the
language of the organic law, in this restricted sense, a con-
struction which is supported by the usage and practice of
our courts and legislative assembly from the organization
of the territory to the present time. As to the manner
of designating the court in each district, which shall be
invested with the extraordinary jurisdiction of circuit and
district courts of the United States, and the time and place
of its sitting, there appears to be but little room for doubt.
As we have seen, the Wisconsin act conferred upon all
district courts jurisdiction under the United States law, and
the number of such courts, as well as the times and places
of holding them, was regulated by the legislative assembly
of the territory. The first six days of each term of court,
or so much thereof as should be necessary, was to be
devoted to business arising under United States law, from
which it appears that a separate term of court, for trans-
acting such business, was not required. Whenever regu-
larly and lawfully convened, the courts were authorized
to administer the laws of the United States in the same
manner as the laws of the territory were administered. In
Iowa and Arkansas, and probably in other territories,
prior to 1856, prosecutions, under territorial law, as
well as under the laws of the general government, were
conducted in the name of the United States, and, so
far as we can learn from reports, the method of proceeding
was the same in both classes of cases. *U. S.* v. *Ross*,
Morris (Iowa), 164; *U. S.* v. *Morgan*, id. 341 ; *U. S.* v.
*Dickey*, id. 412 ; *U. S.* v. *Crittenden*, Hemp (Ark.), 61 ; *U.
S.* v. *Flanakin*, id. 30.

The circumstance, that jurisdiction to administer the laws
of the United States was conferred upon these courts, did
not make them courts of the United States in the sense of
the constitution, a proposition often affirmed by the supreme

court, and very fully elucidated in the late case of *Clinton* v. *Engelbrecht, supra.* It is plain that the extraordinary jurisdiction thus conferred on the courts was intended to be, and was, in fact, exercised at the time and place appointed for transacting the ordinary business of the court, arising under the law of the territory.  As to the extraordinary jurisdiction of the court, neither the legislative assembly, nor any other authority, was required to appoint the time and place for exercising it, but the sessions of the court being fixed by law, without reference to the nature of the business to be transacted, the court was at liberty, at the time and place designated, to proceed in the exercise of all its powers, whether conferred by the laws of congress or of the territory.  Upon this point no change was wrought by the act of 1856, which, as we have seen, reduced the number of courts to one in each district; but by the act of 1858, which restored the former practice as to the number of courts in each district, it became necessary to designate one, which should exercise federal jurisdiction.  This is not expressed in the act of 1858, nor in the prior act of 1856, but it results from the course of legislation, which I have endeavored to trace.  When the jurisdiction was limited to one of several courts, it became necessary to point out that one, and the peculiar phraseology of the acts last mentioned warrants the construction that this duty was to be performed by the judges of the territory. By our organic law this duty is devolved upon the legislative assembly, as a rightful subject of legislation, and we have now to inquire, whether it has been performed in the first district.  The language of the act of 1870 (8 Sess. 59) is somewhat ambiguous, but I think that it may be regarded as conferring the federal jurisdiction upon the district court of Arapahoe county.  If the legislative assembly acted in the belief that the court, when sitting for the trial of causes arising under the laws of the United States, was a separate tribunal, having no legal connection with the district court of Arapahoe county, the intention to refer such causes to that court is, nevertheless, sufficiently expressed, and

should be regarded. But, as we have seen, the declaration that such causes should be heard at the times appointed for the ordinary business of the court was entirely unnecessary, for the reason that, when invested with such jurisdiction by the organic law, the court was required to proceed in the exercise thereof at the regular terms. Therefore, that provision should not be regarded as fixing terms of court, but rather as the declaration of the legislative assembly in respect to the duty of the court to proceed with that business, at the regular terms, a duty which was fully enjoined upon the court by the organic act. I shall not, at this time, affirm or deny the power of the legislative assembly to appoint terms for transacting business arising under the laws of the United States only, as the decision of that question is not material to this case. The act of 1870 is regarded, not as appointing special terms, for the business of the United States alone, but rather as requiring such business to be transacted at the regular terms, and inasmuch as that provision was supererogatory, the omission of it from a subsequent act (9 Sess. 89), by which other terms of court were appointed, is entirely immaterial. Having been invested with jurisdiction in the first district, under the laws of the United States, the district court of Arapahoe county will retain that jurisdiction at all of its terms, until the legislative assembly shall otherwise provide. If, as I have attempted to show, it was the intention of congress to confer upon one court only in each district the jurisdiction of federal courts, no argument will be required to show that the jurisdiction thus conferred will extend throughout the district. Therefore, the objection that the county of Park, constituting a part of the first district, is not within the jurisdiction of the court, is untenable.

In our opinion the act of 1825 (4 U. S. Stat. 108) will not admit of the construction for which counsel contend. The provision of section 22, that if any person shall steal the mail, or shall steal or take from or out of any mail, or from or out of any post-office, any letter or packet, is disconnected from those which follow, and defines distinct offenses. The

first and second counts of the indictment are founded upon this clause, while the third and fourth counts appear to be based upon the succeeding clause. In the clause last mentioned, the offense defined is that of taking a mail, letter or packet with or without the consent of the person having custody of it, which may be a very different thing from stealing or taking it as defined in the first clause, and in this instance the mail, letter or packet must contain an article of value or evidence of debt, etc. In the third and fourth counts the charge is, that the prisoner stole from the post-office at Fairplay, a packet containing an article of value, and embezzled the same, and since every stealing involves a taking, it may be said, that the offense is described substantially in the language of the statute.

Whether the gold-dust and money mentioned in the third count was or was not mailable matter is not material to the offense. The language of the law covers every thing of value, and cannot be limited to those things which the law authorizes to be carried by mail. *United States* v. *Randall*, Deady's Rep. 524. That the law should justify depredations upon the mail, upon the ground that matter has been wrongfully transmitted, is a thing which challenges belief. Other objections to the form of the indictment have not been urged in this court, and in those which have been considered, I find nothing which can be entertained.

The selection of jurors by the marshal, under open venire directed to him, was made the subject of a challenge to the array interposed by the plaintiff in error, which challenge was overruled by the district court. In the civil case, *Clinton* v. *Engelbrecht*, *supra*, which originated in a district court of the territory of Utah, this practice was condemned by the supreme court, and it is claimed that the opinion of the court, in that case, is decisive of the point here presented. That was an action founded upon a statute of the territory of Utah, to recover a penalty for the destruction of certain goods of the plaintiff, which belonged to the ordinary jurisdiction of the court, and did not fall within the jurisdiction of a circuit or district court of the United States.

For the trial of such issue, a law of the territory of Utah had provided a mode of selecting and returning jurors, which was openly disregarded by the district court, and, for this error, the judgment was reversed. The case at bar, being founded upon a statute of the United States, and appertaining to the federal jurisdiction of the court, differs materially from that decided by the supreme court in several important particulars. Conceding that the qualifications of jurors, and the manner of selecting and summoning them, are to be regulated by territorial law, as well in cases arising under the laws of the United States, as in other cases, no provision has been made by the legislative assembly, in this territory, for selecting or summoning jurors in the first-mentioned cases. By article 6 of the amendments to the constitution, a person accused of crime is entitled to a speedy trial by a jury of the district in which the crime shall have been committed, which district shall have been previously ascertained by law, and, unquestionably, the same provision should be observed in selecting a grand jury. The law of the territory (Rev. Stat. 387), respecting the manner of selecting juries, relates to the courts of the several counties, and cannot be applied to the district at large. Unlike *Clinton* v. *Englebrecht*, in which the law of Utah, relating to jurors, had been disregarded, this is a case for which the legislative assembly has made no provision, and the question presented is, whether, in the absence of statutory regulations, the court might lawfully proceed in the manner set forth in the record. As the court was sitting for the trial of causes arising under the laws of the United States, it will be assumed, upon the language of section 10 of the organic law, that the venire was properly directed to the marshal of the territory, and the discussion will be confined to the manner in which the jury was selected. It will not be claimed that the powers possessed by courts are entirely derived from the written or statute law. As is well said in a late edition of a standard work, courts did not originate in constitutions. They were known to the common law, and their powers are there well defined.

If courts possessed only such powers as are granted in constitutions and statutes, they could not protect themselves from insult and outrage ; they could not compel the attendance of witnesses, or obligations to testify when present ; they could not compel the attendance of jurors, nor punish them for improper conduct.    Potter's Dwarris on Statutes, 340.  In our own law, not only the method of proceedings, but the remedies given to suitors are defined almost entirely by the common law.  Of late the judicial power has been regulated by statute more fully that ever before, and still very much of it rests in the common law.  That authority is not conferred by statute, is no evidence that it does not exist, for the common law continually supplements the statute law supporting it at every point, and providing for all its deficiencies.

Of this, the law relating to juries is a good illustration, for, although the qualifications and selection of jurors are now usually regulated by statute, the process for bringing them into court is given by the common law, and their powers and duties are derived almost entirely from the same source.  When the courts of the United States were organized, the qualifications of jurors, in the State or district in which the court was held, and the manner of designating them in such State or district, so far as the same could be practiced in the courts of the United States, was adopted, but the number of jurors was not specified, nor was there any mention of grand juries.  Yet, no doubt was ever entertained as to the number of jurors required in those courts, or as to their proper function in the trial of causes, civil and criminal, and a great jurist has observed that grand juries were by a necessary and indispensable implication.   *U. S.* v. *Hill et al.*, 1 Brock. 156. Above all other features of the common law, the grand jury, and the trial by jury, were especially cherished and elaborated, and as Mr. Justice BLACKSTONE, with much eulogy of the common law, has explained, not only the qualifications of jurors, but the time and manner, and

nature of their service, is fully defined in that law. 4 Black. Com. 350; Bacon's Abr., title Juries.

· In most, if not all, of the States and territories, some changes in the common law, relating to jurors, have been made upon grounds of policy or convenience, but the sufficiency of that law to secure the attendance of jurors upon the courts, has not been doubted or denied. The observation of the chief-justice, in *Clinton* v. *Englebrecht,* that if the subject were not regulated by territorial law, it would be difficult to say that the selection of jurors had been provided for at all in the territories, is not opposed to this view. Although the subject is regulated by territorial law, all of the laws of the territory are not written in the statute book. The courts, being invested with common-law powers, may, in the absence of statutory regulation, draw from the pure and inexhaustible fountain of that law. The marshal being the executive officer of the court, when sitting as a circuit or district court of the United States, and performing, essentially, the duties of a sheriff at common law, it is no objection that the selection of the jurors was intrusted to him, for, by the common law, he was clothed with authority to that end. 4 Black. Com. 350; *Stone* v. *The People,* 2 Scam. 331. The point decided in *U. S.* v. *Woodruff,* 4 McLean, 105, does not arise here, for we are not governed by the act of congress which assimilates the practice in United States courts to the State practice. *Clinton* v. *Englebrecht, supra.*

If the manner of selecting jurors in the several districts were regulated by statute, we should, unquestionably, pursue the statute; and inasmuch as there is no statute, we resort to the common law, without attempting to conform to the method of selecting jurors to serve in the courts of the counties. In the challenge to the array of the petit jury, no objection was made to the qualifications of the jurors, except that they were not drawn from the body of the district or the county of Park, and, therefore, I have not discussed the general subject of the qualification of jurors. It may be useful to remark, in this connection, however,

that it will appear further on, that I entertain the opinion that the laws of the territory, upon that subject, should control. With respect to the ground of challenge referred to, I am not acquainted with any rule which requires that the jurors should be drawn from the county of Park. But, if the marshal did not obey the precept, which required him to select the jury from the body of the district, it cannot be said that the jury was legally constituted. While the venire appears to have been regular, the distinct averment of the challenge, that the jurors were not taken from the body of the district, is confessed by the demurrer, upon which the judgment was erroneously entered against the plaintiff in error.

Some other points, which will probably arise from another trial of the cause, still remains to be considered. From what has been said of congressional legislation in the territories, and the practice in cases arising under the laws of the United States in the courts of the territories, it will, I think, appear that such cases were committed to the territorial courts, to be instituted, prosecuted, and determined, in the same manner, and according to the practice adopted in other cases, arising under the laws of the territory. The primary purpose in establishing territorial courts was to provide for administering the laws of the territory, and when they were equipped for that purpose, the jurisdiction of circuit and district courts of the United States was superadded, to be exercised in the manner, and with the means adopted in other cases, except that a marshal was provided to execute the processes of the court. The argument in the case of *Clinton* v. *Englebrecht*, which affirms the power of the territorial assembly to regulate the practice of the courts, in all cases, leads to this conclusion, and such I understand to be the force and effect of the maxim, *Cursus curiæ est lex curiæ*. When a new power is conferred upon a court, and a method of exercising that power is not specified, the righ of the court to proceed in the usual way, and according to the methods previously known, would seem to be undeniable. In this view, the criminal laws of the United States must

be regarded by the courts of the territory, with respect to the manner of enforcing them, and proceedings upon trials of causes arising under them, in much the same way as if they had emanated from the territorial assembly. That the crime and the punishment are prescribed by act of congress, does not essentially affect the proceedings to enforce the law, except in the matter of the territorial jurisdiction, and the executive officer of the court. In all other respects, a law of the United States is to be administered in the same manner as one enacted by the territorial assembly, and all rules relating to the qualifications and mode of impaneling juries, the competency of witnesses, and the admissibility of evidence, the manner of conducting trials, and instructing jurors, the form and effect of verdicts, the power and duty of the court in respect to new trials, and signing and sealing bills of exceptions, the form of the judgment of the court, and the mode of carrying it into execution, which are observed in the trial of other causes, arising under the laws of the territory, are to be equally observed, and enforced, in cases of federal cognizance. The power of the legislative assembly, to provide special rules of practice in the cases arising under the laws of the United States, is not doubted, but, as there can be no reason for making such special rules, so there should be no presumption that the ordinary rules are not applicable to such cases. If the legislative assembly should make an act criminal, which was not so before, without specifying the mode of proceeding, trials, under such law, would be governed by the general rules of practice, and I submit that the case is not different where new jurisdiction is conferred upon the court by act of congress. The circumstance, that in some of the acts relating to criminal practice, reference is made to "the people," should not be regarded as limiting the operation of such acts to cases arising under the laws of the territory, although, if in the legislation of the territory, a distinction had been raised between the cases arising under federal and territorial law, they might, perhaps, be so regarded. In the acts referred to, the term is used, generically, to indicate

the prosecution, and obviously the legislature intended, in these acts, to establish general rules of practice in criminal cases. Of this character is the act of 1872 (9 Sess. 94), and prior acts, regulating the right to challenge jurors, which are, I conceive, applicable to cases arising under federal, as well as territorial, law, and, therefore, the action of the district court, in denying the right of challenge, cannot be sustained.

The confessions to the witness, Furay, were, unquestionably, made under the influence of promises of favor, which rendered them inadmissible in evidence, unless the circumstance, that a portion of the stolen gold-dust was at the same time produced by the prisoner, was sufficient to exclude the operation of the general rule. Proof of the act of the prisoner, in producing the gold-dust, was entirely competent, but, as to the accompanying declarations, extending beyond the identification of the gold-dust, the weight of authority appears to be against their admissibility. Thus, in *Rex* v. *Griffin*, Russell & Ryan's C. C. 151, evidence of the prosecutor was admitted " that the prisoner brought to him a guinea and a £5 Reading bank-note, which he gave up to the prosecutor, as the guinea and one of the " notes that had been stolen from him," although the confession was obtained under promise of favor. In *Rex* v. *Jones*, Russell & Ryan's C. C. 152, determined by the same court, on the same day, the prosecutor asked the prisoner for the money he had taken from the prosecutor's pack, upon which the prisoner produced 11s. 6½d., and said that was all he had left of it, and this was held not to be admissible, apparently, upon the ground that it amounted to a confession of the prisoner's guilt. In other cases the rule has not been carried further than to admit testimony that the property was found in a place designated by the prisoner, without giving the statements made by him. Bennett & Heard's Leading Criminal Cases (2d ed.), 615. It is said that confessions, improperly obtained, may be safely received whenever the truth of them is established by accompanying acts, of which proof is

made.  1 Greenl. Ev., § 231.  Whether all the adjudged cases in which the question has been presented, can be made to stand upon this proposition, may be doubtful, but it is sufficient for our present purpose to say, that they do not extend beyond the doctrine of *Rex* v. *Griffin; Deathridge* v. *The State,* 1 Sneed, 80 ; *People* v. *Ah-Ki,* 20 Cal. 178 ; 2 Bennett & Heard's L. C. C. 615 ; according to these authorities the fact that the prisoner delivered gold-dust to the witness, Furay, representing it to be that which was stolen, was a proper subject of proof, but the accompanying declaration that the gold-dust was taken by him, having been improperly obtained, was not admissible.  If, after the government has elicited evidence showing that the property was delivered, which had been stolen, the prisoner, upon cross-examination, calls for the statements made by him to the witness, as to the identity of the property, he must, of course, accept the testimony given in reply to his own question.  The meeting between the prisoner and Furay, in January, was, according to previous appointment, and the promises of favor being then reiterated, there is no reason to believe that the hopes or fears first excited, had been dispelled.  The time which intervened between the meeting in October and that in January, was considerable ; but, as the parties were under appointment to meet a second time, and the adjustment of the matter was pending and awaiting further restitution of gold-dust to be made by the accused, he probably came to the second meeting with a hope that he would be able to escape criminal punishment.  Where a confession has been induced by promise of favor, all subsequent admission of the same, or the like facts, must be rejected, if they have resulted from the same influence.  2 Stark. Ev. (ed. 1842), 36 ; 2 Bennett & Heard's L. C. C. 608.  The principle upon which the confessions should have been excluded as first made in October is equally applicable to the repetition of them in January, but this is not true as to the statements made sometime afterward to the witness, Browner.  With him the prisoner's relations were not such as to excite either

hope or fear, and there is nothing to connect this statement with the inducement previously held out by Furay. The time which had elapsed since the meeting with Furay, and the circumstances under which the prisoner met Browner, are sufficient to show that the statements to the latter were voluntarily made, and therefore they were properly received. Other objections to the record are passed without comment, as they will not probably arise on another trial of the cause.

The judgment of the district court is reversed and the cause is remanded for a new trial.

WELLS, J., dissenting. I dissent from the opinion of the chief-justice upon these points: The cause assigned by the prisoner for his challenge to the array, and in the overruling of which error is said to have intervened, is as follows: "Because the said jurors have not been selected and drawn from the body of said district, or county of Park, in Colorado territory, where it is alleged in the indictment preferred against this defendant, the said crime was committed." The allegation, like every other pleading, is to be construed against the challenger. Applying this rule, it will, I think, be apparent that the cause of challenge asserted goes to the poll only, and not to the array ; for while it may be that the prisoner intended to assert that none of the jury came from the body of the district, yet clearly, as I think, it is entirely consistent with his allegation that some of the jurors were drawn from the district, and others from beyond it. If any one of the jury was taken from beyond the district, then what the defendant has alleged as cause of his challenge is true ; the jurors considered collectively, were *not* drawn from the body of the district ; yet clearly, if one only of the panel had been drawn from another district, this should not be ground to quash the whole array, but goes only to the poll.

Again, it is manifest that the prisoner's challenge is a traverse of the marshal's return, which, according to the

only authority which I have seen, is not admissible. *Hare*
v. *Brown*, Cro. Eliz. 369 ; *Rex* v. *Higgins*, Raym. 484 ;
Bac. Ab., Juries, B. 3 E.

2. That the courts of this territory, while exercising their
jurisdiction in causes arising under the constitution and
laws of the United States, are still territorial courts, and
not courts of the United States, is conceded ; that the prac-
tice and course of proceedings in these causes, as well as
in causes arising under the laws of the territory, is within
the scope of the powers conferred by the organic act upon
the territorial legislature, I also concede ; but that they
have regulated or assumed to regulate it, as to the number
of challenges allowed to the accused in an indictment under
the laws of the United States, the only point in question
here, I deny.

The 141st section of the act concerning criminal juris-
prudence contains the first attempt of the legislature of
this territory to regulate the number of challenges to be
allowed to an accused person.   By the act under considera-
tion, the legislative assembly, after defining in detail the
several crimes against society and individuals, under several
divisions and sections, proceed to the 13th division of the
statute.   By section 133 of the statute, which is the first
section of this division, it is provided that the district court,
when any indictment shall be found, shall fix the sum in
which the accused, when by law the offense is bailable, may
be admitted to bail, and the officer who shall make the arrest
is required to let the accused to bail upon his entering into
recognizance in the sum specified, " which recognizance "
it is provided " shall be made payable to the people of the
territory."   By the next section it is provided that it shall
be the duty of the clerks of the district courts to issue pro-
cess of capias for the apprehension of all persons indicted
in said courts, respectively, to be directed "to the sheriff,
coroner and constable of the county where such indicted
person shall then be," and then follows a provision as to
the arrest and return of the accused.

By section 135 it was provided that the clerks of the dis-

trict court shall issue subpœnas " either on the part of the people or the accused, in any indictment." Sections 136 and 137 provide for the manner of summoning the jury, supplying vacancies in the panel, and that the prisoner shall in certain cases be entitled to a copy of the indictment and a list of the jury. By section 138, the manner of pleading is prescribed, " and such plea," it is declared, " shall constitute the issue between the people of the territory and the prisoner." Sections 139 and 140 provide for the cases in which the prisoner shall stand mute, or shall plead the plea of guilty. And by the 141st section it is provided that every person arraigned for any crime punishable with death shall be admitted on his trial to a peremptory challenge of ten jurors and no more ; and every person arraigned for any offense, that may be punished by imprisonment for a term exceeding eighteen months, shall be admitted to a peremptory challenge of four jurors ; and in all other criminal cases the defendant shall be allowed a peremptory challenge of two jurors. The attorney prosecuting on the part of the people shall be admitted to a peremptory challenge of one-half the number of jurors that the accused is entitled to, and no more." The sections of the act of 1861, to which I have referred, continued in force until the revision of the statutes in 1868, and were then re-enacted in the same words (R. S., ch. 22, §§ 203, 212) and so the law continued until the passage of the act of February 9, 1872, concerning criminal proceedings (Laws 1872, p. 94), and in this act, which still remains of force, the provision is, that " the peo ple and the accused shall be entitled each to fifteen peremptory challenges, in capital cases," etc. Therefore, the law stands at present, as it did after the adoption of the criminal code of 1861, save that the number of challenges without cause shown, has been increased ; the same enactments in the same words, are still of force, and apply in the same cases to which the act of 1861 was intended to apply, and in no others. The question is, did the legislature, by the enactment of 1861, re-enacted in the revision of the statutes of 1868, intend to regulate the number of challenges to be

allowed upon the trial of indictments, for offenses against the laws of the United States. If we look to the letter of the particular section merely, I think it is clear that they did not. The concluding words would seem to make it apparent that the purpose of the legislature was to prescribe the number of challenges to be allowed to the accused on one side, and to the people of the territory upon the other; statute can apply, therefore, only to those cases in which the people are party, *i. e.*, to causes arising under the laws of the territory. If any doubt remains after consideration of this section by itself, it will, I think, be dissipated by reference to the context. The organic act provides, section 10, that the marshal shall execute all processes issuing from the district courts, when exercising their jurisdiction as circuit and district courts of the United States; but by the 134th section of this act, as before seen, the legislature provide that process for the arrest of any indicted person shall be directed only to officers appointed under territorial law. Certainly, it is incongruous that, in prosecutions for offenses against the laws of the United States, the accused should be recognized as a penalty payable to any other than the United States, or the executive thereof, and in practice the recognizance of an accused person admitted to bail has, I believe, been invariably made to the president, yet, by the section 133 above cited, it is provided that whenever any person indicted in the district court shall be let to bail, the recognizance shall be made to the people of the territory. If these sections were intended to regulate the proceedings of the courts when exercising the jurisdiction of the circuit and district courts of the United States, the latter is in direct violation of the organic act, and both the former and the latter have from the beginning been persistently set at defiance by the courts. The inference is, I think, irresistible; that they never were intended to be of force in such cases, and that the courts never understood them to be so intended. If these sections do not apply, how can it be said that that touching challenges shall? What reason can be assigned for attributing to the latter section an effect broader

than the former ?   The argument to be drawn from the other sections, to which I have referred appears to me equally convincing.   It would seem impossible, by argument, to make more clear the particular class of criminal prosecutions to which the mind of the legislature was directed in this enactment.   If we look to the contemporary usage and practice of the courts, it will serve to fortify the argument drawn from the words of the statute, for I believe that, until a period dating since the last session of our legislature, it had not been suggested by any one that, in causes arising under the laws of the United States, the courts were governed by the rules of practice prescribed in the criminal code of the territory ; but, on the contrary, the courts in general assumed to conform, in their procedure, to the acts of congress, regulating proceedings in the federal courts.   It was not, I believe, until the announcement of the opinion of the supreme court, in *Clinton* v. *Engelbrecht*, that any doubt was suggested as to the propriety of the usage which had obtained in this respect.   In the opinion of the chief-justice, it is asserted, in substance, that the purpose of congress was, that the jurisdiction of the territorial courts, in causes arising under the laws of the United States, should be exercised according to the practice adopted in other cases arising under the laws of the territory.

I conceive that all questions as to the purpose of congress is beside the mark.   By the organic act, full power was given to the territorial legislature to regulate the practice of the territorial courts, in all cases which might come before them under whatsoever jurisdiction arising (*Palmer* v. *Cowdery*, Feby. T., 1873), and there is no syllable or word in the organic act, or elsewhere in the legislation of congress, which looks to a purpose in congress to control the power of the legislature in this respect.   The whole subject was remitted to them to provide the rule which shall govern.   Was it the intention of the legislative assembly, in the statutes which have been referred to, to exercise this power?   For the reasons before set forth I am clear that such was not their intention.

VOL. II.—27

·. It remains to consider whether the legislature have else-where declared their purpose as to this matter. By the act of October 11, 1861 (Laws 1861, p. 35), it was provided in substance, that the common law of England, so far as applicable, and certain acts of parliament in aid thereof, shall, so far as applicable, and of a general nature, be deemed and taken to be of full force within this territory, until repealed by legislative authority. The common law of England, therefore, whenever and so far as capable of application, affords the rule of decision as to cases in which the legislative assembly have not otherwise provided, and from hence I conceive is to be drawn the rule to govern the present case.

: The offense of which the plaintiff in error was indicted is misdemeanor merely. *U. S.* v. *Mills*, 7 Pet. 141. By the common law, no peremptory challenges of jurors are, in such case, allowed. 2 Hawk. P. C. 580, 581 ; *U. S.* v. *Cottingham*, 2 Bl. C. C. 470. Therefore, the challenges made on behalf of the prisoner were properly denied.

3. The doctrine asserted in the opinion of the chief-justice, touching the admissibility of the confessions of the prisoner, is, I concede, fully sustained by the current of authority. There are, it is true, *dicta*, which assert the admissibility of the confession made in like cases. *State* v. *Crank*, 2 Bailey, 77 ; *State* v. *Moore*, 1 Hogue, 482 ; *State* v. *Jenkins*, 2 Tyl. 377 ; 1 Phill. Ev. (5th Am. ed.) 555*, note 159. But I am not prepared to assert that there is any authoritative decision which is at variance with the doctrine generally received in the courts.

Nevertheless, this is one of those venerable errors abounding in the law which rest altogether upon authority, and are respectable only for their antiquity, as I shall attempt briefly to show.

The reason uniformly assigned for the exclusion of confessions extorted by promises or threats is the unreliable character of confessions delivered under such influences. That the courts pay no regard to the indecency of subjecting an unfortunate person, accused of crime, to flattery, torture or artifice, in order to induce inculpatory

statements, is well established. The rule resting solely upon the supposed probability of the untruth of the confessions, it is to be observed.

1. That the rule established in this instance is at variance with the rule in other cases, where, as is conceded, there is equal probability of deception; e. g., the case of accomplices, approvers, and persons notorious among their associates and acquaintances for their disregard of the truth. The testimony of such witnesses, notwithstanding its admitted unreliability, was, I believe, never rejected.

2. In the other instances in which the probability of deceit has heretofore sufficed to exclude the testimony of witnesses, that is, in the case of parties and interested persons speaking in their own behalf, and persons deficient in religious faith, the rule established by the courts has, with us, and I believe almost everywhere else, been abrogated by legislation; and the general acquiescence with which the new rule has everywhere been received, impels the belief that the fear which excited the courts to the exclusion of such evidence in the beginning, was without just foundation.

3. I think that no one at all acquainted with the practical workings of the rule in question can doubt that it has served more frequently to defeat than to promote justice; and upon this I quote the declaration of a learned commentator, that "The cases probably are rare in which such unfounded self-accusations occur, or at least, where a jury would be misled by them; and certainly the rule occasions, in a multitude of instances, the escape of the guilty. 1 Phill. Ev. (5th Am. ed.) 543.*

4. If the exclusion of the confession rests altogether upon the probability that the confession is untrue, as we have seen, then, if the prosecution produce evidence tending to show and sufficient to warrant the jury in finding that it is *true*, it ought to be received; for in such case the reason of the exclusion is done away. All the courts recognize the propriety of this reasoning, but illogically decline to pursue it to its legitimate results.

If one accused of larceny, being put to torture, confess the crime and produce the goods from his own possession, or disclose the place of their concealment, and they are afterward found in the place indicated, you may, it is agreed, give in evidence the fact of the finding of the goods, conformably to information given by the prisoner; but you may not, in the same case, according to the received doctrine, give in evidence the prisoner's statement that he deposited the goods in the place where they were found, or that he stole them. But why may you not? The reason assigned for receiving so much of the confession as is received is, that in so far it is shown to be true, notwithstanding the improper influence by which it was extorted, *i. e.*, it is shown that it is probably true, for, considering the possibility of perjury in the testimony as to the fact or the place of the finding of the goods, it cannot be asserted that the truth of the prisoner's declaration even as to this is incontrovertibly established; therefore the doctrine amounts to this, that, in so far as the prisoner's confession is shown to be probably true, it shall be received. But I assert, in the case supposed, the finding of the stolen goods at the place indicated not only tends to corroborate the declaration of the prisoner that they will be found there, but also his declaration that he stole them and concealed them at that place, if he make this statement; for the courts, without dissent, agree to this, that the jury will be warranted in finding the prisoner guilty of the larceny upon the mere circumstance that the place of concealment is disclosed by him. And this amounts to saying that the finding of the goods at that place tends to show and warrants the belief that when he confessed to the larceny he spoke truthfully.

In other words, the received doctrine involves this absurdity, that while, in passing upon the primary question whether the evidence shall be received, the court, notwithstanding the corroborating circumstances, shall find the confession probably untrue, and therefore exclude it, the jury, considering the same evidence, may find the very fact confessed to be absolutely true.

For these reasons I am of opinion that the rule which the authorities establish ought to be abandoned. It was in the beginning illogical, at variance with all the analogies of the law, and I am persuaded that only the unfortunate complacency with which the courts have always regarded thieves and malefactors has so long maintained. it. I am of the opinion that the judgment of the district court ought to be affirmed.

*Reversed.*